United States District Court
Southern District of Texas
ENTERED
March 28, 2019
David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **LAWRENCE ROUGIER,** | § | |
| | § | |
| **Lead Plaintiff,** | § | **CLASS ACTION** |
| | § | |
| **v.** | § | **CASE NO. 4:17-CV-2399** |
| | § | |
| **APPLIED OPTOELECTRONICS, INC, CHIH-HSIANG (THOMPSON) LIN, and STEFAN J. MURRY,** | § § § § | |
| | § | |
| **Defendants.** | § | |

**ORDER**

Pending before the Court is Defendants' Motion to Dismiss Plaintiff's First Consolidated Amended Class Action Complaint. **(Instrument No. 53)**.

**I.**

**A.**

The case before the Court is a class action suit for violations of the federal securities laws. (Instrument No. 48). The suit is brought on behalf of purchasers and sellers of the common stock and or call options of Applied Optoelectronics, Inc. ("AOI") between February 23, 2017, and February 21, 2018 (the "Class Period"). *Id.* at 2. Lead Plaintiff Lawrence Rougier alleges that Defendants AOI, Chih-Hsiang (Thompson) Lin ("Lin"), and Stefan J. Murry ("Murry") carried out a scheme to mislead investors by concealing the significant known decrease in demand from Amazon, AOI's largest customer (accounting for 50-60% of AOI's total revenues) as a result of undisclosed product quantity and quality control issues that Plaintiff alleges prevented AOI from being able to timely produce the volume of 100G transceivers that Amazon

was demanding, and the negative impact of competing manufacturing models. (Instrument No. 56 at 8).

**1. Applied Optoelectronics, Inc.'s Products**

Defendant Applied Optoelectronics, Inc. ("AOI") designs and manufactures fiber-optic networking products servicing four different markets: internet datacenters, cable television, fiber-to-the-home, and telecommunications. (Instrument No. 53 at 8). AOI's datacenter customers are generally large internet-based datacenter operators and contributed over 75% of AOI's revenue for 2016 and 2017. *Id.* at 8-9; (Instrument No. 56 at 11). AOI supplies its customers with optical transceivers that plug into switches and servers within the customers' datacenters and allow their network devices to send and receive data over fiber optic cables. (Instrument No. 53 at 9).

AOI's largest customers for the years 2016 and 2017 were Amazon, Microsoft, and Facebook. (Instrument No. 48 at 13).[1] Plaintiff alleges that Amazon represented over 50% of AOI's Class Period revenue. (Instrument No. 56 at 11). AOI's transceivers are plugged into switches and computer servers within these "hyperscale data centers" which store, process, and communicate massive amounts of data for websites, such as Facebook, or for "cloud computing" services, provided by companies including Amazon and Microsoft to other businesses. (Instrument No. 48 at 14). These hyperscale data centers then transmit data through network connections to internet service providers, then onto individual digital devices. *Id.* As consumers and businesses increase their consumption of digital bandwidth, datacenters must increase in physical size and accelerate their data transmission rates. *Id.* Because the transmission speed of the optical transceiver limits the speed at which a datacenter can communicate information, datacenter customers have sought faster, smaller, and more energy-efficient transceivers. *Id.*

[1] Plaintiff and Defendants both repeatedly refer to "Amazon," "Facebook," and "Microsoft," without specifying if they mean the parent companies or any similarly named subsidiaries.

While transceivers capable of transmitting data at one gigabit per second ("Gbps" or "G") were cutting-edge in 2013, 40G transceivers had almost completely supplanted both 1G and 10G transceivers by 2015. *Id.* at 14-15.

100G transceivers entered the market in late 2015, but in limited supply, and demand for 40G devices persisted. (Instrument No. 48 at 15). Plaintiff alleges that in 2016, the majority of AOI's datacenter sales were for 40G transceivers. *Id.* Plaintiff alleges, however, that by the beginning of the Class Period, customers' attention had turned to the newly developed 100G transceivers and the highly anticipated 200G and 400G transceivers. *Id.*

AOI describes itself as utilizing a "vertically integrated" manufacturing system. (Instrument No. 48 at 15). AOI operates manufacturing facilities in Sugarland, Texas, Ningbo, China, and Taiwan. *Id.* In Texas, AOI manufactures laser chips, subassemblies, and components. *Id.* The subassemblies are used by AOI's other facilities in manufacturing components. *Id.* In Taiwan, AOI manufactures optical components, which incorporate laser chips, subassemblies and components manufactured at the Texas location, as well as the transceivers used by the internet datacenters. *Id.* In China, AOI manufactures the more labor-intensive components and optical equipment systems, such as optical subassemblies. *Id.* The majority of AOI's optical transceivers utilize AOI's own lasers and subassemblies. *Id.* at 15-16.

**2. AOI's Statements**

Plaintiff's First Amended Complaint includes statements from confidential witnesses. Plaintiff's first confidential witness ("CW1") allegedly worked for AOI as an engineer involved with optical module and transceiver development, as well as manufacturing and procurement (i.e., procuring components that AOI did not manufacture itself at volume prices for the transceivers). (Instrument No. 48 at 16). Plaintiff's second confidential witness ("CW2")

allegedly was a sales executive at AOI from May until October 2017 for both domestic and international customers purchasing AOI's laser chips. *Id.* at 20.

Plaintiff alleges that throughout the Class Period, Defendants claimed to "have good visibility into [their] customers" and that customers provided AOI with "committed orders" and "demand forecasts." (Instrument No. 56 at 12). According to CW2, AOI's customers were required under their supply agreements to provide AOI projections "before the beginning of each year" of their requirements for the coming year. *Id.*; (Instrument No. 48 at 20-21). A customer communicates these projections to sales people via telephone calls or emails, which the AOI sales executive responsible for that customer then enters into the companywide SAP system. (Instrument No. 48 at 20-21). Plaintiff alleges that AOI's recently released contract with Facebook confirms AOI's model, alleging that Facebook's projections included minimum purchase commitments and six-month forecast requirements. (Instrument No. 56 at 12). Although Plaintiff alleges that "it can be inferred that Amazon had a similar agreement" as Facebook, Plaintiff does not allege that it can confirm that Amazon had such an agreement. (Instrument No. 48 at 23). According to CW2, during the Class Period, customer demand and order changes were monitored weekly and discussed at weekly sales meetings in the Houston office, attended by Fred Chang, who reported to Defendant Lin and who signed the Facebook contract on behalf of AOI. *Id.* at 21; (Instrument No. 56 at 12).

Plaintiff alleges that AOI obtained significant market share for 40G transceivers by capturing Amazon's massive demand, and AOI's internet data revenues doubled from 2014 to 2016. (Instrument No. 56 at 12). AOI attributed its quick rise in the transceiver market to its "vertical integration" model, which AOI claimed gave it a critical advantage over competitors

during the transition from 40G to 100G transceivers throughout the Class Period. On February 23, 2017, the first day of the Class Period, AOI stated at its earnings call:

> Our ability to internally manufacture lasers and light engines combined with our ability to quickly transition production between 40G and 100G products provides us with cost-leadership advantages, a faster time to market and the ability to quickly scale and adjust our throughput to meet growing demand.

(Instruments No. 48 at 16; No. 56 at 12). Defendant Murry further stated at the February 23, 2017, earnings call that AOI "expect[ed] to maintain [its] leadership position as [it] continue[d] the transition to 100G" and that "the similarity between 100G and 40G modules really gives us an advantage in terms of being able to ramp that up quickly." (Instruments No. 56 at 12; No. 48 at 16).

Plaintiff alleges that although Defendants publicly represented that AOI could make a seamless transition from one speed of transceiver to another, behind the scenes, AOI had supply chain issues, making it scramble to accommodate large-scale production of a proliferating array of products for its increasingly demanding customers. (Instrument No. 48 at 16). Chips containing lasers are key components in transceivers, with 40G transceivers containing four 10G chips and 100G transceivers containing four 25G chips. (Instrument No. 56 at 12). Each chip is tested at every stage of the transceiver assembly process to determine if the device is functioning properly, and the percentage of units that meet quality control standards is called the "yield." *Id.* at 12-13. CW1 stated that in 2015 or 2016, AOI recognized its difficulty meeting its desired yield rate of 90% and sent an engineer from the Houston facility to Taiwan to increase yield rates to 90% from its then rate of 40%. (Instrument No. 48 at 17). According to CW1, "[w]hen you just start a new product, you can't get 90% yield immediately" and the higher the speed, the more difficult it is to manufacture the chip. *Id.*; (Instrument No. 56 at 13).

CW1 further claimed that transitioning the manufacturing process from the chips for 40G transceivers to the chips for 100G transceivers was far from simple, an issue compounded by the fact that AOI produced multiple varieties of 40G and 100G transceivers. (Instrument No. 56 at 13). According to CW1, by the summer of 2017, AOI was "desperate" to increase chip production, but the difficulty in switching from the 10G chips, used for 40G transceivers, to the faster 25G chips, used for 100G transceivers, resulted in manufacturing delays, including delays in expanding the Houston facility's "chip coating capacity." *Id.* Plaintiff concludes that because of AOI's problems transitioning to 100G transceivers, he believes that the yield rate for 100G transceivers must have been even lower than 40%, which Plaintiff alleges was an "abysmal" rate. (Instrument No. 48 at 17).

Plaintiff additionally claims that AOI's chips were unreliable and prone to failure. (Instrument No. 56 at 13). According to CW1, AOI's senior management knew that the quality control department in Houston lacked the skills necessary to conduct quality assurance testing and troubleshooting for transceivers which customers sent back to AOI. *Id.* Consequently, AOI senior management delegated the responsibility of testing transceivers to research and development (R&D) engineers who were underequipped to do both quality control and their own jobs. *Id.*; (Instrument No. 48 at 24). CW1 alleged that this was a major flaw in AOI's system which resulted in AOI's Taiwan facility sending a set of defective test transceivers to Amazon during the Class Period. (Instrument No. 48 at 25). Plaintiff concludes that Defendants' claim of vertical integration giving AOI a competitive advantage "in terms of being able to ramp that up quickly" was a charade resulting in inefficiencies and poor quality output. (Instrument No. 56 at 13).

Plaintiff alleges that by May 2017, if not earlier, AOI knew or should have understood that large datacenter customers, particularly Amazon, were pursuing alternatives to AOI's optical transceivers, including the "merchant model," where end-users directed the custom assembly of transceivers using parts from a variety of suppliers. (Instrument No. 48 at 25). One such supplier, MACOM Technology Solutions Holdings Inc. ("MACOM"), stated as early as April 25, 2017, that it was being "actively pulled by top cloud data center customers [i.e. Amazon] to provide various solutions through various customers and channels to fulfill what [it] expect[ed] [to] be insatiable demand. . . ." (Instrument No. 56 at 13-14).

Plaintiff alleges that AOI was aware of this "merchant model" and MACOM's increasing business with hyperscale datacenters, including Amazon. (Instrument No. 48 at 26). However, Defendants Lin and Murry dismissed any competitive pressure from the merchant model during a May 4, 2017, conference call. *Id.* During that call, Defendant Murry contended that "economically, [the merchant model] does not make sense" because the layers of complexity and additional profit margins associated with having multiple companies manufacture these datacenter products would not "result[] in a product that's less expensive for the end customer than buying it from AOI even at the profit margins or gross profit levels that we're at today." *Id.* Plaintiff further alleges that Defendant Lin added that the companies engaged in the merchant model would have "gross margin[s] [that] will be very low compared to AOI's" because the gross margin AOI obtained would have to be "divide[d] [] by 3 companies . . . selling laser, doing types of manufacture, selling transceiver or selling chips." *Id.*

On June 26, 2017, it was announced that Amazon had partnered with MACOM and Fabrinet to provide Amazon with 100G transceivers. (Instruments No. 56 at 14; No. 48 at 26-27). Plaintiff alleges that as a result of AOI's inability to meet demand due to product quality and

other issues, Amazon pieced together its own 100G transceivers using components from MACOM and Fabrinet. (Instrument No. 48 at 27).

On July 13, 2017, AOI issued a press release announcing preliminary second quarter 2017 earnings that Plaintiff alleges should have addressed the changed competitive landscape or the known expected decline in sales to Amazon. (Instrument No. 48 at 27). Defendant Lin stated: "I'm pleased to announce that we expect to deliver another record quarter with our top and bottom-line results expected to exceed our guidance" and attributing the results to "improvement[s] in our manufacturing costs, capacity expansion and solid execution by our production team." *Id.*

Plaintiff alleges that this positive preannouncement led to heavy trading volumes and an increase in AOI's share price of $5.40 to a closing price of $78.04 per share. (Instrument No. 48 at 46). The First Amended Complaint includes the statements of investment banking companies Piper Jaffray and Roth Capital Partners. *Id.* Piper Jaffray allegedly recognized AOI's "impressive quarter with revenue upside and record margin levels that have never been seen before in the optical component industry," and believed that "Applied [had] exceptional visibility through the remainder of 2017 . . . ." *Id.* Roth Capital Partners noted that the press release "didn't provide much detail as to where the specific strength came from, however we assume most of the upside came from datacenter, which continues to see tremendous potential for the company." *Id.*

AOI held its second quarter 2017 press release and earnings call on August 3, 2017. (Instrument No. 56 at 14). Defendant Lin revealed in the press release:

> "We are pleased with our team's continued solid execution in the quarter, which marked our ninth consecutive quarter of generating record datacenter revenue. However, as we look into the third quarter, we see softer than expected demand for our 40G solutions with one of our large customers that will offset the sequential growth and increased demand we expect in 100G.

(Instrument No. 48 at 48). Defendant Murry reiterated the weakening demand for AOI's 40G products during the earnings call, stating:

> As we look into Q3, we see softer than expected demand for our 40G solutions with one of our large datacenter customers that will offset sequential growth and increased demand we expect to see in 100G. This slowdown in 40G demand has been anticipated for some time, but the decline in Q3 is greater than previously expected.

*Id.* at 48-49. Defendants simultaneously claimed that the development was "recent" and "coming a little bit faster" than expected, while stating that Amazon had "a significant amount of committed orders and a good forecast" and with "meaningful 100 gig sales" from all three of AOI's large datacenter customers going forward. *Id.* Defendant Murry further assured investors that AOI's vertical integration model "gives us a significant cost [advantage] even against the MACOM-Fabrinet business model or any of the other competitive business models that we're aware of." *Id.* at 51.

Defendants also revealed for the first time that that the "change-over time" on the product lines was six weeks:

> "[T]here's about a 6-week time from when we produce a laser to when [it] actually gets shipped out as a transceiver. And so the time to actually shift over the production is not long, but the time to – between doing that shift and when you start to see the end product transceivers coming-out is about 6 weeks."

*Id.* at 50.

AOI's share price subsequently fell over 34% on August 4, 2017, to close at $64.60 per share. *Id.* at 51.

Plaintiff alleges that on October 12, 2017, AOI surprised investors with news that third quarter demand from Amazon was "lower . . . overall" with revenues falling 20% below guidance and Amazon revenue dropping from 47% of total revenue during the second quarter of 2017 to a mere 10% during the third quarter of 2017. (Instrument No. 56 at 15). AOI shares fell

over 20% on this news. *Id.* Plaintiff alleges that although AOI's failing vertical integration strategy allegedly caused the decrease in demand from Amazon, AOI stated that "we don't believe that this disruption in the order flow is related to anything AOI-specific" and that AOI "remain[s] a major supplier to all of our major customers for their long-reach transceiver needs and intra-datacenter applications." *Id.*

On February 21, 2018, AOI announced that, despite prior representations that the third quarter 2017 100G sales decline was due only to Amazon's slight lag in transitioning from the 40G transceivers, its *100G* transceiver sales to Amazon had dropped from 56% of datacenter revenue during the third quarter of 2017 to 35% during the fourth quarter of 2017. (Instrument No. 56 at 15). On the news of the immense loss of Amazon market share, AOI's share price dropped over 20% from a close of $34.55 on February 21, 2018, to a close of $27.51 on February 22, 2018. *Id.*; (Instrument No. 48 at 31).

Plaintiff alleges that although Defendants repeatedly underscored the importance of the datacenter market for AOI's revenues, and in particular Amazon's contribution, Defendants knew that the vertical integration model was causing product defects and delays in transitioning from old to new products, prompting Amazon to obtain transceivers elsewhere. (Instrument No. 56 at 15).

As to the individual Defendants, Plaintiff alleges that throughout the Class Period, Defendants Lin and Murry's direct proxies attended weekly R&D meetings where yield and quality issues were discussed and Defendants had access to notes from these meetings. (Instruments No. 56 at 15; No. 48 at 19-20, 61-62). Plaintiff alleges that Lin specifically received monthly status reports during the Class Period from each R&D manager detailing the yield and product quality issues. (Instrument No. 56 at 15-16). According to Plaintiff, Fred Chang, who

reported directly to Lin, signed off on sales contracts and attended weekly sales meetings during the Class Period where all sales numbers and any changes were reported. *Id.* at 16. AOI allegedly entered all sales information into the company-wide SAP system, which was accessible by the individual Defendants. *Id.* Plaintiff concludes that Defendants Lin and Murry knew about product issues and declining sales data and demand forecasts from Amazon. *Id.* Plaintiff further alleges that Defendants Lin and Murry personally profited from their insider knowledge, selling AOI stock during the Class Period, with their largest sales occurring in May 2017, when news of Amazon's interest in the merchant model first became public, garnering both Defendants total profits of over $1.3 million. *Id.*

**B.**

Mona Abouzied filed the class action suit on August 5, 2017. (Instrument No. 1). On August 16, 2017, a related action was filed, *Ludwig v. Applied Optoelectronics, Inc. et al.*, No. 4:17-cv-2512 (S.D. Tex.) (Miller, J.). On October 3, 2017, the Court consolidated the *Ludwig* Action with the present action, *Abouzied v. Applied Optoelectronics, Inc. et al.*, No. 4:17-cv-2399 (S.D. Tex.) (Gilmore, J.).

On January 22, 2018, the Court appointed Lawrence Rougier as Lead Plaintiff. (Instrument No. 44). On March 6, 2018, Plaintiff Lawrence Rougier filed the First Amended Complaint. (Instrument No. 48). Plaintiff's First Consolidated Amended Class Action Complaint seeks to recover damages caused by Defendants' alleged violations of Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j and 15 U.S.C. § 78t, and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. *Id.* at 10-11.

On April 4, 2018, Defendants filed their Motion to Dismiss the First Amended Complaint. (Instrument No. 53). Plaintiff filed his Response on May 4, 2018. (Instrument No. 56). Defendants filed their Reply on May 21, 2018. (Instrument No. 57).

**II.**

Rule 12(b)(6) authorizes dismissal of a civil action for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, the complaint must articulate "the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Stated otherwise, in order to withstand a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011). A claim for relief is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *Montoya v. FedEx Ground Package Sys., Inc.*, 614 F.3d 145, 148 (5th Cir. 2010).

When ruling on a 12(b)(6) motion, the Court may consider "the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."[2] *Wolcott v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (internal quotation omitted); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The Court does not resolve any disputed fact issues. *Smith v. Reg'l Transit Auth.*, 756 F.3d 340, 347 (5th Cir. 2014). Instead, the Court assumes all well-pleaded facts contained in the

---

[2] Matters of which a court may take judicial notice include, for example, matters of public record. *See Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006).

complaint are true. *Wolcott*, 635 F.3d at 763. The Court will not, however "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010) (internal quotation omitted). Similarly, legal conclusions masquerading as factual conclusions need not be treated as true. *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995); *see also Iqbal*, 556 U.S. at 678. Although all well-pleaded facts are viewed in the light most favorable to the plaintiff, *Turner*, 663 F.3d at 775, the Court "will not strain to find inferences favorable to the plaintiff." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (internal quotation omitted). Therefore, to avoid a dismissal for failure to state a claim, a plaintiff must plead specific facts. *Dorsey*, 540 F.3d at 338.

Securities fraud allegations are subject to the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. *Thornton v. Micrografx, Inc.*, 878 F. Supp. 931, 934 (N.D. Tex. 1995). Rule 9(b) requires a plaintiff to plead "with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The rule imposes a standard of pleading higher than the notice pleading requirement of Rule 8(a). "In cases of fraud, Rule 9(b) has long played that screening function, standing as a gatekeeper to discovery, a tool to weed out meritless fraud claims sooner than later." *United States ex. rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009). "This Circuit's precedent interprets Rule 9(b) strictly, requiring the plaintiff to 'specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent.'" *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009). "In cases concerning fraudulent misrepresentation and omission of facts, Rule 9(b) typically requires the claimant to plead the type of facts omitted, the place in which the

omissions should have appeared, and the way in which the omitted facts made the representations misleading." *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006) (quoting *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 381 (5th Cir. 2004)).

The particularity requirement under Rule 9(b) is further defined by the Private Securities Litigation Reform Act ("PSLRA"). *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir. 2005). Congress enacted the PSLRA in 1995 to "prevent the abuse of federal securities laws by private plaintiffs" by increasing the pleading requirements for plaintiffs alleging Section 10(b) or Rule 10b-5 claims. *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 406 (5th Cir. 2001). The PSLRA provides that "'the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state *with particularity* all facts on which that belief is formed.'" *Coates v. Heartland Wireless Commc'ns, Inc.*, 26 F. Supp. 2d 910, 914 (N.D. Tex. 1998) (emphasis in original) (quoting 15 U.S.C. § 78u–4(b)(1)). In addition, a plaintiff must "distinguish among the defendants, attributing each allegedly fraudulent statement to a particular defendant or defendants." *Robertson v. Strassner*, 32 F. Supp. 2d 443, 446 (S.D. Tex. 1998) (Atlas, J.).

## III.

Defendants move for dismissal of all of Plaintiff's claims. (Instrument No. 53). Defendants contend that AOI timely and accurately disclosed changes in demand from one of its major customers and that Plaintiff is relying on hindsight to allege that AOI failed to disclose its anticipated demand reduction from Amazon. *Id.* at 7. Specifically, Defendants contend that (1) Plaintiff has failed to plead specific facts showing that Defendants' statements were materially

false; (2) Plaintiff has failed to plead a strong inference of scienter under the heightened pleading standard of the PSLRA; and (3) the First Amended Complaint fails to plead any corrective disclosures revealing AOI's purported fraudulent scheme. *Id.* at 7-8.

To prevail on a claim that a defendant made material misrepresentations or omissions in violation of Section 10(b) and Rule 10b-5 [promulgated to enforce Section 10(b)], a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 37-38 (2011). Defendants move to dismiss the First Amended Complaint for Plaintiff's failure to adequately plead elements (1), (2), and (6). (Instrument No. 53 at 7-8).

**A. Materially False and Misleading Statements**

Defendants contend that the First Amended Complaint fails to explain why Defendants' public statements were misleading and that the First Amended Complaint engages in improper "puzzle pleading." (Instrument No. 53 at 15-16). Defendants further contend that the First Amended Complaint contains no statements that are materially false or misleading for reasons summarized as follows: (1) Plaintiff has failed to adequately plead that Amazon's forecasts showed a decline in demand prior to August 3, 2017; (2) Plaintiff's factual allegations do not show that AOI had *significant* manufacturing and quality control problems to quickly transition from 40G to 100G transceivers; (3) Plaintiff provides no well-pled allegations that manufacturing, quality control, or competitors caused Amazon's decrease in demand; (4) many of the alleged misstatements are inactionable because they contain pure "puffery," are forward-looking, or are statements of opinion. (Instruments No. 53 at 15-25; No. 57 at 6-11).

Plaintiff responds that the First Amended Complaint adequately pleads materially false and misleading statements because it shows that Defendants were releasing statements that were directly contradicted by declining sales forecasts from Amazon and committed orders from Amazon that were recorded in AOI's SAP system. (Instrument No. 56 at 17-18). Plaintiff further contends that Defendants failed to disclose that AOI was encountering significant manufacturing and quality control challenges in transitioning to 100G transceivers in late 2016 and into 2017. *Id.* at 21-22. Plaintiff also contends that Defendants misrepresented the cause of the decline in Amazon's orders, trying to make it seem that Amazon was slowly transitioning from 40G to 100G, when in reality AOI had production and quality control issues delaying production. *Id.* Plaintiff also contends that because Defendants provided investors with specific facts and misrepresented the present state of AOI, the statements are not puffery, protected as forward-looking, or inactionable opinion statements. *Id.* at 25-27.

A plaintiff making a Section 10(b) claim must show that the defendant made a statement that was "*misleading* as to a *material* fact." *Matrixx Initiatives*, 563 U.S. at 38 (emphasis in original) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)). The question of materiality is an objective one that requires the plaintiff to establish that there was a substantial likelihood that the disclosure of the omitted facts would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. *Basic*, 485 U.S. at 231-32. The "total mix" of information includes information that is readily available to the general public and facts known or reasonably available to shareholders. *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 216 (5th Cir. 2004). There is no bright-line rule for determining whether information withheld from a company's public disclosures is, or is not, material because determining materiality is a "fact-specific inquiry that requires consideration of the source,

content, and context" of the allegedly omitted information. *Matrixx Initiatives*, 563 U.S. at 43 (citing *Basic*, 485 U.S. at 236).

**1. Puzzle Pleading**

Contrary to Defendants' contention, the First Amended Complaint is not a "puzzle pleading." *Owens v. Jastrow*, 789 F.3d 529, 537 (5th Cir. 2015) (describing a puzzle pleading as a complaint where a court must "wade through a complaint and pick out properly pleaded segments"). The First Amended Complaint identifies each allegedly misleading statement, the individual speaker, the date on which the statement was made, the context in which the statement was made, and why the statement was misleading given AOI's internal quality control and yield issues and Amazon's decline in orders. Although Plaintiff recites the same boilerplate reasons for why Defendants' statements are misleading, Plaintiff's explanations for the falsity of Defendants' statements logically correspond with each alleged misstatement. This case, therefore, is not analogous to the cases Defendants have cited in support of their assertion that Plaintiff has failed to plead with particularity. *Cf. Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1243-44 (N.D. Cal 1998) (65-page complaint failed to conform with Federal Rule of Civil Procedure 8 and required a "laborious deconstruction and reconstruction of a great web of scattered, vague, redundant, and often irrelevant allegations."); *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178-79 (5th Cir. 1997) (oral statements with no time or place; prospectus excerpts with no analysis as to falsity; news articles with no indication of false statements or falsity explanation); *In re Entrust Sec. Litig.*, No. 2:00CV119, 2002 WL 31968321, at *2-3 (E.D. Tex. Sept. 30, 2002) (large block quotes with heavy reliance on third-party analyst statements and no context or significance attributed to them).

**2. Defendants' Knowledge of Amazon's Declining Demand**

Plaintiff has not directly alleged that Defendants knew of Amazon's declining demand. The First Amended Complaint instead relies on factual allegations of surrounding circumstances to conclude that Defendants knew of Amazon's decrease in orders prior to their public disclosure of this information. Plaintiff specifically notes that throughout the Class Period, Defendants publicly touted their visibility into customers' future orders and AOI's forecasts in customer demand. Plaintiff identified numerous statements by Defendant Murry where Murry stated that "[s]trong customer demand for datacenter and solid execution by the AOI team will drive higher sequential datacenter revenue" (Feb. 23, 2017), that "we think we're doing a reasonably good job of anticipating and meeting the demands of the customers have [sic] told us that they're going to need for this year and next year," (Mar. 22, 2017), and "[b]ased on current orders and forecasts from our customers, we believe that 2017 datacenter revenue should grow by more than 85% compared with 2016." (Instrument No. 56 at 18). Plaintiff also provided the statements of CW2 who explained that AOI contractually required its customers to provide projections of their requirements for the coming year. Once AOI's sales personnel received the projections, they entered the information into AOI's SAP system to track developments and changes on a weekly basis. Plaintiff also asserts that it believes that Facebook's supply agreement, requiring accurate six-month rolling forecasts, mirrors Amazon's supply agreement with AOI.

Plaintiff cannot charge Defendants with intentionally misleading their investors about facts that Defendants may have become aware of *after* making allegedly misleading statements to the public. *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 698 (5th Cir. 2005). However, Plaintiff's factual allegations support the inference that Defendants knew that Amazon had decreased its orders when they made their statements during the Class Period. Plaintiff has specifically noted

that prior to the beginning of each year, AOI's customers provided their order forecasts. Thus, Defendants would have had Amazon's order forecasts prior to the beginning of the Class Period set at February 2017. Unless the drop was very sudden, a drop in anticipated future sales would have been preceded by a change in forecasts and committed purchase orders. Plaintiff's allegations that AOI actively tracked its customers' orders on a weekly basis and AOI was experiencing quality control and yield problems in 2016 support the inference that AOI knew prior to the February 2017 earnings call and press release that Amazon had decreased its orders. This inference is particularly compelling because Amazon represented over 50% of AOI's revenue and AOI's revenue from Amazon dropped so drastically from 47% of total revenue during the second quarter of 2017 (ending June 30, 2017) to 10% during the third quarter of 2017 (ending September 30, 2017). (Instrument No. 56 at 15). "Further discovery may refute the inferences, but it is not unwarranted to infer that when a company's big deal collapses so fast, something was amiss at the outset." *Plotkin*, 407 F.3d at 698; *see In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 745 (S.D. Tex. 2012) (Ellison, J.) (noting that, except for inferences to show a strong inference of scienter, the court must draw all reasonable inferences in favor of the plaintiff in its Rule 12(b)(6) analysis). Plaintiff has provided specific facts to support his assertion that Defendants delayed disclosing Amazon's decrease in demand of AOI's transceivers. Furthermore, Plaintiff has alleged sufficient facts to show that Defendants' omission regarding Amazon's decrease in demand is material. A reasonable investor would have viewed the drop in orders from Amazon, AOI's largest customer, as a significant fact to alter the total mix of information available.

**3. AOI's Ability to Quickly Transition from 40G to 100G Transceivers**

Plaintiff's factual allegations further support his allegation that Defendants made materially misleading statements regarding AOI's ability to transition from 40G to 100G transceivers. AOI released numerous statements, each identified and quoted in the First Amended Complaint, that AOI had the ability to meet the growing demand faster than competitors. Defendants specifically touted that AOI was the market share leader in the 100-gig web-scale transceivers and that AOI had no concerns about Amazon shifting to a competitor. (Instrument No. 48 at 41-43). Plaintiff's factual allegations show that these statements were misleading because AOI was experiencing quality control and yield issues that prevented its transition to 100G transceivers starting in 2016. Defendants counter that Plaintiff has not presented sufficient facts to show that these quality control issues were *significant* enough to affect AOI's transition to producing 100G transceivers. (Instrument No. 57 at 9). However, Plaintiff has alleged through the statements of his confidential informants that quality control and yield issues were a frequent topic at weekly meetings with senior executives. CW1 stated that Houston's facility had yet to expand its chip coating capacity and that AOI was "desperate" to increase its production capacity. (Instrument No. 48 at 19). Viewing the allegations in the light most favorable to Plaintiff, AOI could not truthfully state that it had a faster time to market for its 100G products. Even if its vertical integration model was theoretically more efficient than the merchant model, at the moment Defendants made their statements, they misrepresented AOI's ability to quickly transition to 100G transceivers.

**4. The Cause of the Decline in Amazon's Orders**

Plaintiff has provided sufficient factual allegations to show that AOI's quality control and yield setbacks led to Amazon's decrease in committed orders. The First Amended Complaint

alleges that Amazon decreased its demand for transceivers because AOI could not provide Amazon with the quality and quantity of transceivers that Amazon desired. CW1's statements in the First Amended Complaint show that the quality control department at the Houston manufacturing facility lacked the skills necessary to conduct quality assurance testing and return material authorization troubleshooting for transceivers that customers sent back. The First Amended Complaint further alleges that Amazon required high numbers of test devices for its quality assurance process and that although it was known that "[y]ou want to send Amazon your best quality products," AOI had sent a defective set of test transceivers to Amazon. (Instrument No. 48 at 25). Plaintiff's allegations create an inference that Amazon's shift to adopting the merchant model with MACOM and Fabrinet by the first quarter of 2017 and AOI's declining committed orders from Amazon were caused by AOI's production and quality control problems.

Plaintiff has further shown that rather than disclose AOI's own problems, AOI shifted the blame onto Amazon. After AOI revealed that Amazon had decreased its orders, Murry stated at the October 12, 2017 earnings call that "we believe that the disruption in order flow is related to the ongoing transition from 40G to 100G and not specific to AOI." (Instrument No. 48 at 53). Plaintiff's factual allegations show, however, that Amazon's decrease in orders was caused by AOI's internal production problems. The First Amended Complaint adequately pleads that Defendants made misrepresentations and omissions regarding the cause of Amazon's declining orders.

**5. Whether the Alleged Misstatements are Inactionable as Forward-Looking, Puffery, or Opinion Statements**

Defendants argue that many of the alleged false statements in the First Amended Complaint constitute "forward-looking statements" protected by the PSLRA's safe harbor

provision.[3] A statement is inactionable if it is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1). In determining whether a statement falls within the safe harbor, this Court must examine which aspects of the statement are alleged to be false. A forward-looking statement, for instance, whose falsity consists of a lie about a present fact is not protected by the PSLRA's safe harbor provision. *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 213 (1st Cir. 2005); *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 691 (5th Cir. 2014) ("we join the First Circuit, Third Circuit, and Seventh Circuit in concluding that a mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." (internal quotation omitted)).

The statements identified in the First Amended Complaint that contain forward-looking statements rely on present facts regarding AOI's vertical integration strength. Defendants allege that AOI disclosed detailed risk factors in its Form 10-Ks addressing the risks associated with these forward-looking statements. (Instrument No. 53 at 26-27). However, Defendants' statements projected a promising picture of increased revenues and manufacturing capacity while omitting material information regarding AOI's then inability to quickly transition from 40G to 100G and Amazon's subsequent decline in demand.

Similarly, Defendants' contention that the statements are inactionable puffery or merely opinion statements fails because the statements contain the allegedly false embedded fact that manufacturing issues at AOI were not responsible for Amazon's decrease in demand. "Non-actionable puffery are statements of the vague and optimistic type that cannot support a securities

---

[3] Defendants refer the Court specifically to Appendix B of their Motion to Dismiss, which collects and organizes each statement in the First Amended Complaint that is allegedly forward-looking. (Instrument No. 53-2).

fraud action . . . and contain no concrete factual or material misrepresentation." *Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 599 (W.D. Tex. 2014) (internal quotation omitted). Plaintiff has alleged specific facts to show that Defendants' statements were belied by AOI's actual ability to transition to 100G transceivers and AOI's prior but delayed disclosure that AOI would have a significant drop in orders from Amazon as a result of AOI's production problems. *In re BP p.l.c. Sec. Litig.*, No. 4:10-MD-2185, 2016 WL 3090779, at *9 (S.D. Tex. May 31, 2016) ("the plaintiff 'must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.'" (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1332 (2015))). The First Amended Complaint alleges that Amazon's drop in demand was caused by AOI's manufacturing problems, although Defendants omitted these facts from investors. The First Amended Complaint therefore shows that Defendants either did not actually hold the opinion they orally stated or that Defendants omitted material facts that conflicted with what a reasonable investor would take from the statement itself. *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 245 F. Supp. 3d 870, 892 (S.D. Tex. 2017) (Rosenthal, J.) (noting that under *Omnicare*, statements of opinion can be actionably misleading (1) when the speaker does not actually hold the expressed opinion; or (2) when the speaker omitted material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and those facts conflict with what a reasonable investor would take from the statement itself).

**B. Strong Inference of Scienter**

Defendants contend that Plaintiff's First Amended Complaint fails to plead a strong inference of scienter against Defendants, particularly individual Defendants Lin and Murry. (Instrument No. 53 at 29-31). Defendants also claim that Plaintiff improperly relies on allegations provided by confidential witnesses. *Id.*

**1. Factual Allegations by Confidential Witnesses**

Defendants contend that this Court must discount the allegations in the First Amended Complaint from confidential sources. (Instrument No. 53 at 31).

The Court in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.* instructed that in determining whether the securities fraud complaint gives rise to a "strong inference" of scienter, courts must consider plausible competing inferences. 551 U.S. 308, 323-24 (2007). Following *Tellabs*, courts have cautioned that anonymous allegations in a complaint frustrates a court's ability to consider plausible competing inferences. *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 535 (5th Cir. 2008) (citing *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 756-57 (7th Cir. 2007)). However, *Tellabs* did not prohibit a plaintiff from using confidential witness statements. The Fifth Circuit instead allows a plaintiff to use confidential sources as long as those sources are described "'with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information pleaded.'" *Shaw*, 537 F.3d at 535 (quoting *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 353 (5th Cir. 2002)).

The First Amended Complaint uses information provided by two confidential witnesses. Plaintiff alleges that both CW1 and CW2 worked for AOI during the Class Period. Although they remain anonymous, Plaintiff has provided specific details about them, including their job

descriptions, individual responsibilities within AOI, and specific employment dates for each witness. (Instrument No. 48 at 16-17, 20-21). Plaintiff's allegations that are based on his confidential sources are specific and provide the bases for those witnesses' conclusions regarding AOI's internal and manufacturing processes. Accordingly, the Court can consider the statements of the confidential witnesses, although those anonymous statements would be inadmissible at trial, to determine if they support Plaintiff's allegation of scienter in the First Amended Complaint.

**2. The First Amended Complaint's Allegations of Scienter**

A plaintiff bringing a Section 10(b) and Rule 10b-5 action must show that the defendant acted with a "mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 (1976)). "To plead scienter adequately, plaintiffs must state with particularity facts giving rise to a strong inference that the party knew that it was publishing materially false information, or the party was severely reckless in publishing such information." *Shaw*, 537 F.3d at 534 (internal quotation omitted). Severe recklessness is not negligence, but is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading . . . which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 408 (5th Cir. 2001). Similarly, the PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs*, 551 U.S. at 314; 15 U.S.C. § 78u-4(b)(2). "Accordingly, for purposes of a Rule 12(b)(6) motion to dismiss, a strong inference of

scienter is one at least as compelling as any opposing inference of non-fraudulent intent." *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d at 745.

In showing that an individual defendant acted with scienter, a plaintiff "may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company." *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002). Thus, a court must "look to the state of mind of the individual corporate official or officials who make or issue the statement . . . rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004).

Plaintiff's First Amended Complaint identifies each Defendant making the allegedly materially false statements. Defendant Lin founded AOI and was its Chief Executive Officer ("CEO") since its inception. (Instrument No. 48 at 9). Defendant Murry has been AOI's Chief Financial Officer ("CFO") since August 2014 and Chief Strategy Officer since December 2012. *Id.*

Contrary to Defendants' contentions, the First Amended Complaint goes beyond generally alleging the collective knowledge of AOI's officers. The First Amended Complaint relates how, during the Class Period, Defendants received oral and written reports and attended internal meetings with senior executives, salespeople, and engineers to discuss AOI's manufacturing problems and Amazon's forecast and sales. Plaintiff alleges that Defendant Lin received reports from AOI's R&D manager that detailed AOI's manufacturing problems, including low yield and production issues. Plaintiff further alleges that AOI's Texas facility held weekly meetings with various product engineers, engineers, senior engineers, and with Lin's special assistant David Chen, who was also in charge of corporate quality assurance. (Instrument

No. 48 at 17). According to Plaintiff, AOI's yield issues at their facility in Taiwan were a frequent topic of discussion at these meetings in Texas. *Id.*

Plaintiff provides fewer factual allegations regarding Defendant Murry's knowledge of AOI's yield issues. The First Amended Complaint alleges that Murry had access to AOI's SAP system, the company-wide enterprise resource planning program that includes customer relationship management tools that track customer forecasts and purchases. (Instrument No. 48 at 61). However, this allegation is a general claim about the existence of corporate reports that reveal contrary information to Murry's statements and is alone insufficient to survive a motion to dismiss. *Abrams*, 292 F.3d at 432.

The First Amended Complaint, however, contains specific and strong circumstantial evidence of conscious misbehavior or recklessness by Murry. For instance, Plaintiff alleges that Murry was privy to and participated in the creation, development and reporting of AOI's financial condition (*See* Instrument No. 48 at 71). Murry's statements admit that he had active involvement in AOI's manufacturing capabilities and Amazon's forecasts and sales. The First Amended Complaint alleges that AOI's yield and quality issues were widely known and discussed among AOI senior officials. Amazon was also AOI's largest customer during the Class Period contributing over 50% of AOI's revenue immediately prior to and during the Class Period. (Instrument No. 48 at 13). Plaintiff alleges that although Amazon had decreasing forecasted purchases of transceivers, Murry delayed in disclosing this information to investors. "The Fifth Circuit has held that material misstatements as to a company's most significant asset can give rise to a strong inference that those misstatements were made with knowledge of their falsity or severe recklessness in not knowing that they were false." *In re OCA, Inc. Secs. &*

*Derivative Litig.*, No. 05-2165, 2006 WL 3747560, at *18 (E.D. La. Dec. 14, 2006) (citing *Plotkin*, 407 F.3d at 699-700).

Moreover, Plaintiff alleges that Murry and Lin had motives to delay disclosing the reality about AOI's sales of transceivers to Amazon. Specifically, Plaintiff alleges that Lin sold 12,186 shares during the Class Period for a gain of over $729,000 and Murry sold 11,498 shares (18% of his total holdings) during the Class Period for a gain of $630,468.77. (Instrument No. 56 at 34). Plaintiff alleges that Lin and Murry made the sales on two separate occasions in May 2017, when share prices were high immediately after AOI announced positive first quarter 2017 earnings on May 4, 2017 and before AOI disclosed Amazon's reduced demand of transceivers. (Instruments No. 48 at 62-63; No. 56 at 34-35); *see Shaw*, 537 F.3d at 543 ("Insider stock sales may be probative of scienter, however, if they occur in suspicious amounts or at suspicious times." (internal quotation omitted)). While Defendants have shown that Plaintiff has not alleged any smoking gun facts showing that Murry and Lin acted with scienter, Plaintiff need not plead these facts to withstand dismissal at this stage. "[U]nder the PSLRA circumstantial evidence can support a strong inference of scienter." *Nathenson*, 267 F.3d at 410. Plaintiff's factual allegations support his claim that Murry and Lin had the requisite scienter.

**C. Loss Causation**

Defendants also move to dismiss the First Amended Complaint for failure to plead loss causation. Under the PSLRA, a plaintiff must plead a "causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). "For a plaintiff to plead loss causation adequately, the negative truthful information ('corrective disclosures') must not have already been known to the market: If it were, the stock price would have incorporated that information, and its disclosure could not have caused a loss." *Alaska Elec.*

*Pension Fund v. Asar*, 898 F.3d 648, 665 (5th Cir. 2018). "At the pleading stage, 'plaintiffs are required to allege the truth that emerged was 'related to' or 'relevant to' the defendants' fraud and earlier misstatements.'" *Id.* (quoting *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014)). Moreover, a plaintiff need not identify a single disclosure. "[R]ather, the truth can be gradually perceived in the marketplace through a series of partial disclosures." *Id.* (quoting *Amedisys*, 769 F.3d at 322).

Notably, this element of a Section 10(b) claim need only set forth a "short and plain statement of the claim showing that the pleader is entitled to relief" and provide the defendant with "fair notice of what the plaintiff's claim is and the grounds upon which it rests." Fed. R. Civ. P. 8(a); *Dura Pharm.*, 544 U.S. at 346 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

Plaintiff has identified three partially corrective disclosures that he alleges are directly relevant to the alleged false statements: (1) AOI's August 3, 2017, press release where it revealed for the first time that Amazon's demand for 40G transceivers was much less than the alleged previous misrepresentations ("we see softer than expected demand for our 40G solutions with one of our large customers") and AOI's admission that it took six weeks to produce new 100G transceivers; (2) AOI's October 12, 2017, press release and earnings call where it revealed for the first time that Amazon's softer than expected demand also included 100G products, resulting in a decline in Amazon revenue from 47% to 10% for both 40G and 100G transceivers; (3) AOI's disclosure on February 21, 2018, that the transition from 40G to 100G was not occurring as smoothly as Defendants had led investors to believe and that AOI was experiencing "inventory headwinds" with Amazon and that AOI's revenue, prior to previous representations, was primarily based on 40G products (58%), and its sales of 100G products had decreased from the previous quarter from 56% of revenue to 35%. (Instruments No. 48 at 48-55, 58-59, 65; No.

56 at 36-37). Plaintiff has additionally identified that subsequent to Defendants' disclosures, AOI's share price dropped by 20% to 34% each time. (Instrument No. 48 at 64-65). The First Amended Complaint sets forth the specific statements that relate to Defendants' previous statements and how the marketplace perceived these corrective disclosures. The partial corrective disclosures support an inference that Defendants' misstatements and omissions concealed the circumstances that bear upon the loss and that the partial corrective disclosures were closely followed by a fall in AOI's stock price. The Court finds that Plaintiff's allegations satisfy Rule 8(a) in pleading loss causation.

Accordingly, the Court finds that Defendants' Motion to Dismiss Plaintiff's claims under Section 10(b) is DENIED. (Instrument No. 53).

## IV.

Plaintiff alleges that individual Defendants Lin and Murry are liable as control persons under Section 20(a) of the Exchange Act. (Instrument No. 48 at 73). Defendants move to dismiss Plaintiff's Section 20(a) claims against individual Defendants Lin and Murry. (Instrument No. 53 at 36).

Section 20(a) imposes joint and several liability on "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder" for securities fraud. 15 U.S.C. § 78t(a). "Control person liability is secondary only and cannot exist in the absence of a primary violation." *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 383 (5th Cir. 2004). Defendants' Motion only argues that Plaintiff's Section 20(a) claims fail as a matter of law because his underlying Section 10(b) claims fail. Because this Court has found that Plaintiff has adequately pleaded his claims under

Section 10(b), the Court finds that Defendants' Motion to Dismiss Plaintiff's Section 20(a) claims is DENIED. (Instrument No. 53).

V.

For the foregoing reasons, the Court finds that Defendants' Motion to Dismiss the First Amended Complaint is **DENIED**. **(Instrument No. 53)**.

The Clerk shall enter this Order and provide a copy to all parties.

**SIGNED** on this the 27th day of March, 2019, at Houston, Texas.

**VANESSA D. GILMORE**
**UNITED STATES DISTRICT JUDGE**